Our first case is BPI Sports, LLC v. ThermoLife International, LLC. Counselor Dowd, you have reserved two minutes of time for rebuttal, is that correct? Yes, Your Honor. Counselor Hilliard, you have 13 minutes for your response and two minutes for cross-appeal. Is that correct? Correct, Your Honor. Okay, I think we're ready to go. Good morning, Your Honor. May it please the Court, Matthew Dowd for the appellants. If I may, I'd like to start with the literal falsity issue, then turn to the speculative nature of the damages with respect to the injury element of the Lanham Act claim, and then spend some time on the sanctions issue. On the literal falsity issue, in our brief we set it forth pretty clearly, but I think the most straightforward path to understand why J-Mal should have been granted was looking solely at BPI's evidence. If you look at what their expert testified to, their expert testified that when a user takes our product, the CRTN3 product, and when the user weighs 113 pounds or less, that user will experience vasodilation. So it cannot be unambiguously false, and therefore it does not qualify as literal falsity. That alone resolves the J-Mal issue. And so there's a really good quote from the Second Circuit in the Apotex v. Accord case, and there the Second Circuit... The claim that you have vascular dilation, but it only works if you're 113 pounds, isn't that misleading? Your Honor, it may be misleading, and this is solely looking at BPI's evidence. And the jury didn't find us liable based on a misleading claim, so that's the first point. The second point is BPI's burden to prove that it was misleading, they never did so, because the second element of proving... Did the jury find that that statement was false? Literally false, but not misleading, and that's the key distinction here. Was the material misleading theory presented to the jury, or only the literally false theory? So that's a good question, and I don't think BPI ever made it clear, but the jury verdict form did. It gave the jury the option to select whether it was misleading or not. They did not. Again, that resolves the J-Mal issue in terms of literal falsity. The second point I'll add on that, and this is important as well too... Yes, Your Honor. Can you give me the specific page where the jury verdict form will get it? Yes, Your Honor. That is at the very end of Volume 3 of the appendix, and if you bear with me for one second... Let's see... I had that a moment ago, but I could find that in a second, Your Honor. 52-63-64, something like that. 52-63-64. Yes, that sounds right, Judge Stark. Thank you. And when you look at that jury verdict form, you see the first question for the jury was whether the statement was literally false, and then the second question is about misleading. And the way the jury instruction... The jury verdict form was if you select... If the jury selected literally false, then they skipped the misleading. Now, let me just add another important point, and this is... We emphasize this in our brief as well too. If you look at pages 46 and 47 of the blue brief and page 1 of our reply brief, the yellow brief, if it's a misleading claim under the Lanham Act, the plaintiff has to present evidence of actual consumer deception, and there's zero evidence of this. There's zero evidence of any consumer deception. There's zero evidence of any consumer buying our product instead of their product. And so even if the jury reached the misleading claim, then it still would have been right for J-Mall, Your Honor. If we were to reverse the denial of your J-Mall and order that the J-Mall be granted, what, if any, other issues in your appeal do we have to reach? Well, that's the only issue in terms of liability, but that would bring us to the sanctions appeal. So the jury instruction question about the materiality would become lewd, correct? Correct. Because you don't necessarily have to reach the materiality issue at all. And I wasn't going to bring that up today. Okay. The sanctions question, though, it was a little unclear, but I had understood you to be challenging the jury instruction about credibility. And of course, there would be no jury instruction if you get J-Mall because there would not be a new trial subject to their appeal, correct? Yes, Your Honor. Is it something else you're seeking on the sanctions besides just, hey, if there's a new trial, we don't want this jury instruction? Yes, Your Honor, right? Because there is an award of attorney's fees. And just the decision that Mr. Kramer committed a fraud on the court, that should be reversed for multiple reasons. I didn't see anywhere in your brief that you said we want the attorney's fees we were ordered to pay returned to us. Is that something you're asking? Well, I think it's subsumed within the argument that we presented, right? Because if we, if the court were to vacate that decision on the sanctions, that would necessarily vacate any order on the attorney's fees. And I would like to turn, since we brought up the sanctions issue. Yes, Your Honor. So if we reverse on causation, then the case falls, right? The entire case is, it's over. Correct, Your Honor. Okay. Yes. Well, let me ask you this, thank you, before we move on. There was the unfair competition claim, I think under Florida law, correct? Correct, Your Honor. And the jury found you were liable under that theory as well, correct? Yes. And the way it was presented and the way it's been argued to this court is that the liability under Florida state law for unfair competition is wholly dependent on the Lanham Act claim. So there's no difference in the law. It rises and falls depending on what we do with the other. Correct, Judge Reynolds. Yes. Is that, how do I know that? I understand you have asserted that they haven't disagreed with it. But I'm a little concerned that that may not actually be Florida law. So the main case that we cite is the Sun Tree case. And this is a 11th Circuit case. And it stands for that proposition. And that is in our brief. And I think if I recall correctly, in the pre-trial order and the jury instruction, it was never disputed that the elements to prove the unfair competition under state law were essentially identical to the elements under the Lanham Act. Thank you. And I was going to bring up the damages. Speculation. It's entirely speculative. The one point I will say on that, Your Honors, is going back to briefs, I just honestly have to apologize. There's a key case that we do cite, but we don't discuss in enough detail. And that's the air turbine, sorry, the air technology turbine, air turbine technology versus ATLAS. It's a Federal Circuit case from 2005 written by Judge Schall, which is Lori and Judge Perser on the panel as well, too. And it presents the almost identical theory of damages in terms of Lanham Act, in terms of the injury element. In that case, the party presented a theory of poisoning the entire tool industry market. And that's exactly what BPI did here, because they haven't shown a single diverted sale from them to us. They expressly disclaim any responsibility to show this direct connection between their supposed lost profits and our sales. At the end of the day, their theory is nonsensical, because they're claiming X amount of damages, which is far exceeded the sales of our product. And on top of that, their sales were declining before our product even entered the market. And I would ask that the court, I know you've read it, but if you want to go back, it's a nearly identical basis for rejecting their theory of injury under the Lanham Act. So with that, I could turn to the sanctions issue, Your Honor. And I think this is a really critical point here, because this was not a sanction for a violation of Rule 37 or a violation of Rule 11. This is the court invoking its inherent authority. And the Supreme Court... Yes, ma'am? Did Mr. Kramer fabricate the license agreement? Is that accurate, or did you forget? That's absolutely not accurate, Your Honor. And if I could just give a second of the background on that. Mr. Kramer is essentially the controlling member of both Muscle Beach and Thermolife. At a minimum, he had an implied license between the two companies in terms of their patents. They probably had an oral license. It could have been a mental license, because he's the one who controls both companies. And what happened was, when you look at the timeline of the case, this is going back to March 20th, 2020. The first R production in terms of their first RFPs. And what Mr. Kramer did, in good faith, was to memorialize in a written document what he believed was the license at the time in 2017. And this ties back to a really important point, because what BPI did here was they essentially sued the wrong party. The product at issue is not a Thermolife product. It's a Muscle Beach product. It's always been that way. We told Muscle Beach the same day... Well, let me just ask a follow-up question. So, isn't the license indicating they had an effective date in 2017, but it was actually created in 2020? Is that accurate? So, Your Honor, I think that goes to BPI's question, or attempt to make hay about the fact that there is no date of the signature. But there was an effective date. And what we tried to show is that this is entirely consistent with all the other licenses that Thermolife had. Always an effective date, right? And that's actually quite... But that sounds like the answer to Judge Cunningham's question is yes. The document was created in 2020, but purported to be effective as of 2017. That's not in dispute, correct? Yes, Judge, and I apologize for not answering the question directly. And in fact, that's what Mr. Kramer told in his interrogatory response. Truthfully, that's what he... But I think the problem for you is it's an abusive discretion standard. And your side did not disclose the discrepancy in timing between the effective date and the memorialization date until you were pushed on it. And that looked suspicious to the trial court. And the court acted on that suspicion. And I don't know how we say that's an abusive discretion. And here's a response to that, Judge Stark, is that the main legal error that was committed here was that there was this repeated assertion that the creation of the license agreement and the details of how it was created remained relevant in the case. And once Thermolife assumed liability for Muscle Beach in June of 2020, and this is after we sent them a Rule 11 letter saying, you need to sue Muscle Beach, not us, they amended the complaint... Can you answer Judge Stark's question about how it's a part of that abusive discretion? For several reasons, Your Honor, because it doesn't reach a level of clear and convincing evidence of a fraud upon the court. The judge repeatedly made, and this is both the magistrate judge and the district court judge, repeatedly continued this mistaken belief that it remained relevant in the case. And it was never relevant in the case once we assumed liability. Right, but it was relevant. You were sanctioned for a course of conduct in connection with discovery. That's why I thought you were only appealing the adverse jury instruction. There'd be some weight to your argument that it was irrelevant at trial, but that doesn't help you if you want to vacate things that happened before trial. So here's the response, I don't think that we did justice to this point in our brief. The hearings and the motion to compel, and this is where it came from, were June 19th, 2020. At the end of that hearing, the magistrate judge concluded that both parties were substantially justified, and this is in terms of their objections to discovery. We were compelled to provide a response to the interrogatory. The interrogatory response is truthful, it's not false. There's never been a false statement in this case. There's never been a violation of any court order. And what I would say, your honors, is that there's a complete disconnect when we get to the point of the magistrate judge concluding that in the context of a discovery dispute, we were substantially justified, therefore no fee shifting. And then three months later, when BPI continues this, it's a fictional narrative, to say that all of these things, but when they say that, there's a disconnect to say that we committed a fraud on the court, but then just a few months earlier, the judge concluded that we were substantially justified for not providing an interrogatory response at that time. There's never been a false statement about the creation of the document. They don't assert that to this day. There's never been a dispute, at least from June of 2020, that the document had any relevance to... Would you agree that the document was fabricated for litigation purposes? Absolutely not, your honor. It was Mr. Kramer's good faith attempt to provide a written memorialization of an agreement between two parties. There's never been a valid dispute that there's not at least an oral and implied license between... It looks like you don't just have an issue with the oath that's utilized, all right? Because you have a belief that it supports to the effect of one thing that was created in a way. Yes, your honor. There's no dispute about that, right? And that happens all the time. We explained that in that brief. Parties routinely, routinely create... But you did not, your client did not voluntarily disclose that fact. It looked to the district court as if you were fabricating evidence and trying to mislead. Your honor... That's how it looked to them, correct? I think that's what they concluded. But what I would say is that at most, that rises at most to the level of recklessness. And we have to remember the Supreme Court Chambers versus NASCA, they say when we're invoking the inherent authority of the court to sanction somebody, the court has to exercise discretion and restraint. Every case that BPI cites in this brief presents facts that come nothing close to this case. You have instances where parties have fabricated, actually fabricated evidence and then found, and actually later admitted under oath that they did in fact fabricate evidence. So for example, the McDowell versus... You're well into your... You used up the rebuttal time and everything. So I'll restore your rebuttal time when it's your turn again, okay? Thank you, Judge Rankin. Let me just make sure that Judge Cunningham or... I'm fine, thank you. Okay, thank you, Judge Rankin. Good morning, Your Honors. Gregory Heller on behalf of BPI Sports, both an appellee and a cross-appellant in this matter. I'm really pleased the court had to use most of my time addressing some of the arguments that were made by Mr. Dowd as well as the questions that were posed by the court. First, I want to take on this issue of literal falsity. The jury found that the claims that CRTM-3 caused vasodilation were literally false because the product is marketed to an adult population. You cannot market a dietary supplement to children. So that means that for the average-weighted person, not the smallest or the largest, but the average consumer did not experience vasodilation. Why do we... How do you get credit for the average? You're not here to say that the record proves there's no adults that are under 113 pounds, correct? No, but the question... So how could a jury reasonably find it literally false when it's undisputed that if you're an adult under 113 pounds, and you take the dose that's recommended on the label, you will experience increased vasodilation? How can it be literally false? First of all, there was evidence produced at trial through our expert that the amount in question would not affect an average adult by using the opinion of the expert as to what constituted that. So the evidence for the average adult standard that you seem to be applying, I apologize, I just can't remember. The expert that climbed on that average-weighted adult was based on empirical data taken from various sources. What's the legal relevance of that, I think, is what we're asking. The average adult standard, where does the law say that that's relevant? Sure, so if the population exists in a distribution of weight, if you were to say it's a bell curve, there's going to be a metaphor to average adult. What is the legal basis that you have for that legal standard as opposed to just telling us how averages work? The evidence was based on the expert's opinion offered at trial that an average adult would not experience vasodilation, and in order to do that, he'd have to apply it on... The alleged false statement, as I understand it, was not for the average adult, this is false. The allegation was that it was literally false for all adults. Which is why he went on to say that in order for this to even theoretically be effective, and I want to get back to that in a second, theoretically be effective, you'd have to at least have this much weight. Now, what... This much what? Correct, you'd have to at least weigh 113 pounds even for this to theoretically have an effect. Now, what Thermalife has done is taken a leap and said, well, this establishes that somebody of that weight or lower would necessarily experience vasodilation, and that was never adduced at trial. I don't think there was a single question asked about it, and there was certainly no evidence admitted that showed that anyone having that weight or less would or did experience vasodilation. That's just a myth. Okay, but the burden is on you to have proven to the jury by a preponderance that their statement increases vasodilation is literally false.  What evidence, if at all, could a jury reasonably interpret in your favor as supporting that finding? Let's just take a common sense approach. If a consumer walks into a CVS and buys aspirin, and it says alleviates headaches, it takes it home, and they take it, and it doesn't alleviate headaches, and you find out later, oh, you have to weigh 113 pounds or less for this to work, that's a literally false statement. I don't think that there's a... What's left to a materially misleading theory if that's literally false? Because if you... Well, a literally false statement is the epitome of a most valuable statement. Sorry, if the evidence at trial was that one person walked into the drugstore, took that dosage, and their headache got better, it seems to me the statement is now not literally false. Does the panel literally believe that you can market a product that says it causes a certain condition and not inform the purchaser that higher than 90% of the population is not going to experience that? And the answer is that no, Julie, you could find this literally false. I don't believe that that... I'll give you a hypothetical. For most of my life, I've weighed less than 113 pounds. If I were to walk into a CVS and take this, would I experience this condition? That's my point exactly, Your Honor. There's no evidence that you would, because it wasn't our job to show that at these smaller rates, the product worked. There was no evidence. What we showed was the majority of population, a far higher than the majority of population, would not experience this. And that's certainly sufficient for a jury to find, based on the standard on appeal, that the statement was false. What evidence do you have that any consumer had a purchase decision that was at all impacted by this one statement, one out of six that I saw on the label, increases vasodilation? Did you show... How could a jury have found that anybody's decision was impacted by this? Yeah, Your Honor. Through our brief, we give instances of testimony in which both sides indicated that getting a so-called pump from these products is what bodybuilders look for. And of those indications that are on the label, they're all related to vasodilation. You don't allege that five of the six are false. The only thing you allege on that label that's false is, quote, increases vasodilation, right? Sure, but that doesn't necessarily mean that no one based their purchasing decision on that particular condition. Both sides agreed throughout the case. In fact, in one of Mr. Dodd's questions that he posed to a witness, he said, maybe they're buying it for the pumps. Because that's what this product is meant to do. If you're a bodybuilder and you buy a product that says you're going to increase athletic performance, you're going to increase performance, blood flow, vasodilation, those are all related to the same condition, which is that you're trying to get a muscular pump. That's the entirety of what bodybuilders try to do. So the idea that you could promote it for a particular purpose and then take the position after saying at trial that everybody's looking for pumps, that there was no material reliance, it just evades reality. Again, it's like promoting something for curing headaches and then say, well, how do you know they bought it to cure headaches? Well, that's what it was marketed for. This isn't an esoteric indication on a label. This is what Thermolite blasted out in every advertisement they ever had. Can I ask about the materiality instruction that was not given? Do you disagree that this instruction that they proposed that was not given was a correct statement of the law? I agree with the instruction. I might get caught up in the double negative, but I agree with the instruction that's given. Forgive me, no apologies necessary. I'm a little hoarse myself. The issue I think you're referring to is this J.B. Weill landslide of cases concerning what I might call an esoteric quality that a consumer might not necessarily know about. This isn't an esoteric quality. This is the performance of the drug itself. Let me see if I can speak literally. 5219, they wanted the jury to be told BPI must prove materiality of defendant's advertising by showing that defendant's deception is likely to influence consumer's purchasing decisions. I understand that to be the instruction they requested that wasn't given. I understand you don't think it had to be given, but is it a correct statement of the law? Is it a correct statement of the law? Not if it's an inherent quality of the product. Again, I hate to beat a dead horse, but if you come back to the aspirin and headache analogy, is it necessary to show after you've advertised aspirin to alleviate headaches that somebody relied on the fact that the specific reliance on the therapeutic effect of the product, but not when it's the only or a large part of the basis for the advertisement in the first instance. It just doesn't make any sense. It's like selling a sports car. The problem with your hypothetical or the scenario that you're pointing out is that in CVS, when you go in to buy the aspirin, you buy it for any age group. And here, the product is designed for, it seems to me, to be muscle builders, individuals. I generally agree with that, Your Honor. But again, as much as we've defined a broad category of what the purchasers might fall into, those purchasers are looking for a certain thing. They don't need to be told, this is good for building muscles, or you didn't show anybody bought this to build muscles, because it would be somewhat absurd to suggest that that's not what they bought it for. It's like saying, well, you didn't show somebody bought a car to get from here to there. Where's your evidence of that? Or a sports car, you didn't show that they wanted to go fast. It's promoted as a car that goes fast. Do you agree that the unfair competition appeal rises or falls with the Lanham Act appeal? No, I don't. Because it's reflected in the verdict sheet, which Judge Cunningham asked to see. The colloquy to the jury was, did somebody involved in a fraudulent or deceptive conduct? Wasn't there an agreement to tie the two together? That the state claims would rise or fall with the Lanham Act claims? Well, no, because a major part of this case was false patent marking. We're not talking about false patent marking. That's not on appeal, correct? Well, Your Honor, unfair competition is an umbrella term under Florida law that it goes to any fraudulent or deceptive conduct. It's not limited to the Lanham Act claims. So you deny that there was an agreement at the trial court that the Florida unfair competition law claim would rise or fall with the Lanham Act claim? I do disagree with that, because I believe I even argued in closing that the fact is, is that we've got several instances of deceptive conduct. We've got false advertising. We've got false marking. And the verdict sheet indicates that the jury was inclined to agree with us. But these products were falsely marked, which is a false... What about on appeal? Have you made that argument to us? I think what we argued in response to that argument is that the only thing that they've raised is the Lanham Act claim. So that's the only thing we addressed. Certainly never jettisoned the idea. I understood them to say they were appealing the liability finding on unfair competition, the denial of their JMAL, and that the argument they would offer for that part of their appeal is the same, essentially, as their argument on the Lanham Act. And I thought I understood your brief to say essentially, that's fine with us. No, it wasn't fine with us. It was their decision to limit their appeal. So address the statement that's made in the red brief on page 57. You mean my brief there? Go ahead, John. You have it under number six, page 57. Seems to me that that's contrary to what you're telling us right now. Due respect, Your Honor, I don't think it is inconsistent to the extent that parents represent. Parents represent. Therefore, we rely on the same arguments. We never said that was our position. We said that they've limited it to this, so this is what we're going to argue. But to come in here now and say that the false advertising claim beg your pardon, was the only thing considered under unfair competition just defies the gravity of the entire trial. But when you say to us, you're relying on the same arguments for unfair competition that you were relying on for Lanham Act, I understand my job as an appellate judge is to evaluate only the same arguments that I've already evaluated with respect to the Lanham Act. And therefore, if I agree for the sake of argument with the appellants on the Lanham Act, it must logically follow that I agree with the appellants on the unfair competition. And therefore, on appeal at least, those claims would rise or fall together. Only if you're willing to accept the premise, which has been handed to you, which is that an unfair competition claim is limited. We never said that. In fact, it's even more narrow in our brief. We say they represent that the legal analysis is the same. Yeah, and you don't say, hey, we disagree. Don't fall for that, judge. That's wrong. I don't think it's manifest. That's not how the case was tried. That's not what Florida law is. Don't you have some obligation to tell me that? But the beauty is you're not hearing it from me now. And there's nothing in this brief that precludes me from making that argument because we never agreed. Did you ever make that argument in briefing to us? Because the pages that I want to say, the particular page that Judge Raymond pointed to in assessing the judge's thoughts as to what's happening with you, seems to indicate that these arguments are largely falling together. Where did you sit when we encountered that? Your Honor, I think this may have been the center of addressing Fenton Life and the other appellants' arguments because that's what we were doing. It was a responsive brief. But you can see from the verdict sheet alone that this is not the same standard. Talking about fraudulent and deceptive conduct. And so, in as much as patent marking sounds in fraud, that jury instruction was written to encompass any fraudulent or deceptive conduct that they underwent. That's not the argument you made before where that's being made in your red brief. If it is, I'd like for you to show me where that's at. Sorry, Your Honor, that the unfair competition claim includes... It seems to me that what your statement in the red brief is that your state claims are going to rise and fall with your Nanomat claims. Again, due respect, that was never our premise, nor did we represent that. The best I could do, I'm not going to take time out, is look through the trial transcript, which I certainly encourage the court to do. But see, that was what was argued below. It's not really... Go back and we'll look at that. But you are out of time right now. Let me see if my colleagues have any questions. I just want other sanctions, if I might. Under the 11th Circuit, which is governing authority here, do you agree that when the court sanctions based on inherent authority, bad faith has to be the only explanation for the alleged sanctionable conduct? I don't agree with that, no. And what authority would you cite for saying that's not the 11th Circuit standard? I would be out of time. It's in your brief. It would be manifested in our brief. I think we do take that head-on in the argument, and argue it in the alternative. If we don't believe that is the standard, and to the extent we have cited cases, we'll rely on those. But even if it were the standard, arguendo, it's still a good idea. It was never any reasonable basis for them to fabricate a license agreement, other than to do so in bad faith.  Judge Cunningham, do you have any... Okay, thank you. Thank you very much, counsel. Mr. Dowd, you have two minutes. Thank you, Your Honor. I shall be quick. Your Honor, on the Florida State law claim, I think you're exactly on point. Red brief 58, BPI expressly says BPI relies on the same argument. So they clearly rise and fall. They expressly waive any other argument. Let me turn back to the sanctions issue, and Judge Stark, you asked a question which I should have answered better before, in terms of the legal basis for why the court's decision is wrong. And this goes to the purchasing power case from the 11th Circuit. And BPI does not cite any other law. And in that case, the 11th Circuit is clear that it has to be the sole reason for the alleged conduct. And if you go back to, or when you go back to the district court's order adopting the R&R, and I believe this is at Appendix 13, and there's a footnote, and the district court judge tried to distinguish purchasing power on the fact that, well, that's sanctions in the context of attorneys. But the court had it backwards because sanctions with respect to attorney conduct should be held to an even higher standard than a party, a party who's not an attorney, by the way. The other important legal point is that in all of the cases that BPI cites, essentially, the issue, right, that was the cause of the conduct went to a linchpin issue in the case. So, for example, the Vargas case was an employment discrimination case. And the plaintiff there fabricated evidence in terms of ladies' undergarments. They actually went to Target to buy undergarments and claimed that these were related to the case, they falsely were not. And they actually admitted that falsely under oath or declaration later in the case. You have none of that here in terms of there's no violation of a prior court order. There's absolutely no assertion that Mr. Kramer ever lied under oath. There is no violation of a motion to compel. We comply with the motion to compel. And I think most importantly, the disconnect between the later finding of inherent authority to sanction with the earlier finding on the motion to compel and substantially justified cannot be reconciled. Okay. Thank you. Thank you, Your Honor. We thank the attorney for the arguments and we take this case under admonition.